IN THE

# United States Court of Appeals for the Seventh Circuit

IN RE BROILER CHICKEN ANTITRUST LITIGATION

END USER CONSUMER PLAINTIFF CLASS,
*Plaintiffs-Appellants*
v.
AGRI STATS, INC.,
*Defendant-Appellee*

Appeal from the U.S. District Court for the Northern District of Illinois
The Honorable Thomas M. Durkin
Case No. 1:16-cv-08637

## OPPOSITION BRIEF OF DEFENDANT-APPELLEE AGRI STATS, INC.

WILLIAM L. MONTS III
JUSTIN W. BERNICK
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

*Counsel for Agri Stats, Inc.*

December 12, 2025

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-2298</u>

Short Caption: <u>End User Consumer Plaintiff Class v. Agri Stats, Inc.</u>

 To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

 The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

  [ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Agri Stats, Inc.</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Hogan Lovells US LLP; Miller, Canfield, Paddock & Stone, P.L.C.; Please note that Covington & Burling LLP appeared</u>

<u>for Agri Stats, Inc. in the district court, but withdrew from the matter in 2018.</u>

(3) If the party, amicus or intervenor is a corporation:

  i)  Identify all its parent corporations, if any; and

   <u>Agri Stats Omega Holding Company LLC</u>

  ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   <u>N/A</u>

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  <u>N/A</u>

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  <u>N/A</u>

Attorney's Signature: <u>/s/ William L. Monts III</u> Date: <u>December 12, 2025</u>

Attorney's Printed Name: <u>William L. Monts III</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** [✔] **No** [ ]

Address: <u>Hogan Lovells US LLP, 555 Thirteenth Street, N.W., Washington, D.C. 20004-1109</u>

Phone Number: <u>(202) 637-6440</u> Fax Number: _____

E-Mail Address: <u>william.monts@hoganlovells.com</u>

                    rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2298

Short Caption: End User Consumer Plaintiff Class v. Agri Stats, Inc.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Agri Stats, Inc.

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Hogan Lovells US LLP; Miller, Canfield, Paddock & Stone, P.L.C.; Please note that Covington & Burling LLP appeared
for Agri Stats, Inc. in the district court, but withdrew from the matter in 2018.

(3)      If the party, amicus or intervenor is a corporation:

   i)          Identify all its parent corporations, if any; and

   Agri Stats Omega Holding Company LLC

   ii)         list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ Justin W. Bernick          Date: December 12, 2025

Attorney's Printed Name:  Justin W. Bernick

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** [ ]    **No** [✔]

Address:  Hogan Lovells US LLP, 555 Thirteenth Street, N.W., Washington, D.C. 20004-1109

Phone Number: (202) 637-5485          Fax Number:

E-Mail Address: justin.bernick@hoganlovells.com

rev. 12/19 AK

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| INTRODUCTION | 1 |
| JURISDICTIONAL STATEMENT | 4 |
| STATEMENT CONCERNING ORAL ARGUMENT | 4 |
| COUNTERSTATEMENT OF THE ISSUE PRESENTED | 5 |
| COUNTERSTATEMENT OF THE CASE | 5 |
| A. Agri Stats' Benchmarking Business | 5 |
| B. Investigations and Litigation against Meat Processors and Executives | 9 |
| C. The District Court's Summary-Judgment Decision for Agri Stats | 11 |
| SUMMARY OF ARGUMENT | 19 |
| STANDARD OF REVIEW | 23 |
| ARGUMENT | 23 |
| A. Plaintiffs Identify No Evidence that the Information Exchanged Through Agri Stats Caused a Substantial Anticompetitive Effect | 27 |
| 1. The Undisputed "Nature of the Information Exchanged" Cannot Prove a "Substantial Anticompetitive Effect" | 30 |
| 2. Plaintiffs Identify No Evidence of Actual Anticompetitive Effects Attributable to Agri Stats' Reports | 39 |
| B. Alternative Grounds Support the District Court's Decision | 53 |
| 1. Plaintiffs Cannot Demonstrate Antitrust Injury | 54 |
| 2. Plaintiffs Cannot Demonstrate Market Power | 55 |
| 3. Agri Stats' Reports Generate Significant Procompetitive Benefits That Plaintiffs Have Not Shown Could Be Achieved Through Less Restrictive Means | 57 |
| CONCLUSION | 60 |

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*1-800 Contacts, Inc. v. FTC,*
  1 F.4th 102 (2d Cir. 2021).......................................................... 46, 49

*Am. Column & Lumber Co. v. United States,*
  257 U.S. 377 (1921).......................................................... 29, 39, 46

*Am. Steel Erectors v. Local Union No. 7, et al.,*
  815 F.3d 43 (1st Cir. 2016) ...............................................................58

*Amory Invs. LLC v. Utrecht-Am. Holdings, Inc.,*
  74 F.4th 525 (7th Cir. 2023) ......................................................... 16, 53

*Arandell Corp. v. Xcel Energy Inc.,*
  149 F.4th 883 (7th Cir. 2025) ..............................................................47

*Atl. Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990)...............................................................................55

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.,*
  784 F.2d 1325 (7th Cir. 1986)...............................................................56

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
  441 U.S. 1 (1979).....................................................................................24

*In re Broiler Chicken Antitrust Litig.,*
  No. 1:16-cv-8637 (N.D. Ill.) .....................................................................9

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977)................................................................................54

*Cal. Dental Ass'n v. FTC,*
  526 U.S. 756 (1999)................................................................................45

*Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*
  95 F.3d 593 (7th Cir. 1996).............................................................. 26, 46

*Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*
961 F.2d 667 (7th Cir. 1992)..................................................................54

*Com. Funding Corp. v. Worldwide Sec. Servs. Corp.,*
249 F.3d 204 (4th Cir. 2001)................................................................57

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013).................................................................... 42, 43

*Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.,*
715 F.2d 1115 (6th Cir. 1983)..............................................................49

*Copperweld Corp v. Independence Tube Corp.,*
467 U.S. 752 (1984)...............................................................................44

*Deslandes v. McDonald's USA, LLC,*
81 F.4th 699 (7th Cir. 2023), *cert. denied,* 144 S. Ct. 1057
(2024)...................................................................................... 25, 57

*Donovan v. City of Milwaukee,*
17 F.3d 944 (7th Cir. 1994)...................................................................32

*Fourqurean v. NCAA,*
143 F.4th 859 (7th Cir. 2025) ...................................................... 24, 45

*Grant v. Trs. of Ind. Univ.,*
870 F.3d 562 (7th Cir. 2017).................................................................43

*In re High Fructose Corn Syrup Antitrust Litigation,*
295 F.3d 651 (7th Cir. 2002).................................................................13

*Israel Travel Advisory Serv. v. Israel Identity Tours, Inc.,*
61 F.3d 1250 (7th Cir. 1995).................................................................33

*Jien v. Perdue Farms, Inc.,*
2020 WL 5544183 (D. Md. Sept. 16, 2020)........................................24

*King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.,*
791 F.3d 388 (3d Cir. 2015) ..................................................................59

*Kleen Products LLC v. Georgia-Pacific LLC,*
910 F.3d 927 (7th Cir. 2018).................................................................13

*Kochert v. Greater Lafayette Health Servs., Inc.,*
463 F.3d 710 (7th Cir. 2006) ...................................................... 49

*MacDermid Printing Sols. LLC v. Cortron Corp.,*
833 F.3d 172 (2d Cir. 2016) ....................................................... 46

*Maple Flooring Mfrs. Ass'n v. United States,*
268 U.S. 563 (1925) ............................................................. 29, 46

*Marion HealthCare, LLC v. S. Ill. Hosp. Servs.,*
41 F.4th 787 (7th Cir. 2022) .................................................. 43, 55

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) .................................................................... 28

*Mil. Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.,*
823 F.2d 829 (4th Cir. 1987) ...................................................... 47

*Moultrie v. Penn Aluminum Int'l, LLC,*
766 F.3d 747 (7th Cir. 2014) ...................................................... 23

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,*
883 F.3d 32 (2d Cir. 2018) .......................................................... 59

*NCAA v. Alston,*
594 U.S. 69 (2021) ................................................ 26, 30, 48, 59

*NYNEX Corp. v. Discon, Inc.,*
525 U.S. 128 (1998) .................................................................... 49

*O'Brien v. Caterpillar Inc.,*
900 F.3d 923 (7th Cir. 2018) ...................................................... 54

*Ohio v. American Express Co.,*
585 U.S. 529 (2018) (*Amex*) ............................................. *passim*

*In re Pork Antitrust Litig.,*
No. 0:18-cv-01776 (D. Minn.) ............................................. *passim*

*Procaps S.A. v. Patheon, Inc.,*
845 F.3d 1072 (11th Cir. 2016) .................................................. 47

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
 28 F.3d 1379 (5th Cir. 1994) ................................................................47

*Sanderson v. Culligan Int'l Co.*,
 415 F.3d 620 (7th Cir. 2005) ...............................................................26

*Schering Corp. v. Ill. Antibiotics Co.*,
 89 F.3d 357 (7th Cir. 1996) ..................................................................57

*In re Sulfuric Acid Antitrust Litig.*,
 703 F.3d 1004 (7th Cir. 2012) ..............................................................24

*In re Text Messaging Antitrust Litig.*,
 782 F.3d 867 (7th Cir. 2015) ..........................................................27, 28

*Thomas v. Wardell*,
 951 F.3d 854 (7th Cir. 2020) ................................................................32

*Todd v. Exxon Corp.*,
 275 F.3d 191 (2d Cir. 2001) ........................................................ *passim*

*In re Turkey Antitrust Litig.*,
 No. 1:19-cv-8318 (N.D. Ill.) ..............................................................9, 10

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
 513 U.S. 18 (1994) ................................................................................56

*United States v. Agri Stats, Inc.*,
 No. 0:23-cv-03009 (D. Minn.) ...............................................................10

*United States v. Container Corp.*,
 393 U.S. 333 (1969) ..................................................................27, 38, 39

*United States v. Penn*,
 20-cr-00152-PAB, Dkt. No. 1156, Trial Tr. Day 24, 4788:5-9
 (D. Colo. Dec. 8, 2021) ..........................................................................10

*United States v. U.S. Gypsum Co.*,
 438 U.S. 422 (1978) ..........................................................................24, 44

**Federal Statutes**

Sherman Act, 15 U.S.C. § 1 .............................................................. *passim*

**Rules**

Circuit Rule
    28(b) ............................................................................................ 4
    34(f) ............................................................................................ 4

Federal Rule of Appellate Procedure 34(a)(1) ............................................ 4

**Other Authorities**

18A Charles Alan Wright et al., *Federal Practice and Procedure*
    § 4433 (3d ed. 1992) .................................................................. 56

## INTRODUCTION

For forty years, Agri Stats has collected information from broiler chicken producers and published aggregated, anonymized benchmarking reports and provided related services. Since Agri Stats began issuing its reports, per capita production of boneless, skinless breast meat, the most demanded broiler chicken product in the United States, has tripled while its inflation-adjusted price has dropped by about seventy-five percent. Nonetheless, a decade ago, Plaintiffs—a class of end consumers who bought chicken products from grocery stores and other retail outlets— sued Agri Stats and eighteen of the largest broiler chicken processors under Section 1 of the Sherman Act and various state antitrust laws, alleging two theories of antitrust liability.

Plaintiffs' principal claim was that processors entered a *per se* unlawful conspiracy to restrict supply and raise prices of chicken, allegedly facilitated in part by Agri Stats' reports. Their second, and subsidiary, claim was that Agri Stats' benchmarking reports themselves violated the antitrust laws because they permitted chicken-processor subscribers to exchange price and output information, which in turn purportedly increased prices. The District Court granted Agri Stats

1

summary judgment on both claims, concluding that no reasonable jury could find "Agri Stats agreed with the producer defendants to restrict supply and increase the price of Broilers," SA62, and "there is scant evidence that the information Agri Stats itself provided to each individual producer was used in a manner that had an anticompetitive effect," SA64–65.[1]

In this Court, Plaintiffs have abandoned any challenge to the District Court's judgment on their *per se* claim. Br. at 5 n.17. The District Court's judgment should be affirmed, therefore, unless the evidence at the summary judgment stage raised a triable issue that the processor defendants *both* tacitly coordinated on the output or prices of chicken *and* that Agri Stats' benchmarking reports *themselves* enabled that coordination. Plaintiffs' brief on appeal shows neither.

***First***, Plaintiffs contend the District Court "misstat[ed] the evidence, including the age and content of Agri Stats' reports."[2] But

---

[1] Citations to the Short Appendix attached to Plaintiffs' opening brief are noted with the designation "SA."

[2] Plaintiffs take issue with the District Court's statement that "[a]ttempting to deanonymize Agri Stats reports is simply a rational response of competitors trying to gain an advantage over each other," SA55, and frame it as one of the central issues of this appeal. Br. at 4. That statement, however, was part of the District Court's analysis related to the now-abandoned *per se* claim. SA55.

Plaintiffs fail to identify any dispute of material fact regarding Agri Stats' reports—a complete set of which is included in the summary judgment record—or any facts contradicting the District Court's conclusion that Agri Stats' reports are anonymized, backward-looking, and do not include any competitor price or output information. Plaintiffs further identify no legal error in the District Court's conclusion that these undisputed facts fail to raise a triable issue of anticompetitive effects.

*Second*, Plaintiffs concede that their antitrust claim requires evidence showing that Agri Stats' reports have a "substantial anticompetitive effect that harms consumers in the relevant market." Br. at 49–50. The District Court considered the evidence Plaintiffs proffered on that score and concluded that it did not raise a triable issue. SA62–65. Neither Plaintiffs' anecdotes nor expert analyses show that Agri Stats' reports caused *any* increase in price or reduction in output, much less the substantial, market-wide effects necessary to survive summary judgment. No court has ever held that an information exchange claim raises a trial issue without actual evidence of harm to competition. Armchair economics and anecdotes are not enough.

The District Court carefully examined the extensive record in this case and granted Agri Stats summary judgment. None of the arguments mustered on appeal warrant disturbing the District Court's judgment. This Court should affirm.

## JURISDICTIONAL STATEMENT

In accordance with Circuit Rule 28(b), to the extent that Plaintiffs' jurisdictional statement recites jurisdiction issues, Agri Stats notes that it is complete and correct. Plaintiffs' jurisdictional statement, however, also contains characterizations and non-jurisdictional arguments—namely, the assertion that Plaintiffs purchased chicken at "artificially inflated prices." Br. at 2. Agri Stats does not concede the correctness of those statements and, accordingly, does not join those portions of Plaintiffs' jurisdictional statement.

## STATEMENT CONCERNING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(1) and Circuit Rule 34(f), Agri Stats submits that oral argument is not necessary to assist the Court in adjudicating this appeal. The issues in this case are unremarkable and straightforward.

## COUNTERSTATEMENT OF THE ISSUE PRESENTED

Whether the District Court correctly granted summary judgment in favor of Agri Stats, when it is undisputed that: (i) no subscriber to Agri Stats' reports receives the price or output information of any other subscriber; and (ii) Plaintiffs adduced no evidence that Agri Stats' reports caused price increases or output reductions in the relevant market, much less the substantial, market-wide effects necessary to create a triable issue under controlling law.

## COUNTERSTATEMENT OF THE CASE

### A. Agri Stats' Benchmarking Business

Agri Stats is a small business headquartered in Fort Wayne, Indiana. Dkt. No. 5899-2 at ¶ 2. It has never produced or sold broiler chicken products. *Id.* at ¶ 3. Rather, since 1985, Agri Stats has distributed benchmarking reports and related services to its roughly twenty-five broiler chicken producer subscribers—enabling them to become more efficient and reduce their costs through standardized metrics that help uncover areas for improvement. *Id.* at ¶¶ 2, 4–6. Those benchmarking reports depend on historical data that participating producer companies submit. *Id.* at ¶¶ 6–8. Agri Stats audits, analyzes, and anonymizes the data it receives, and uses the anonymized data to

fashion six different reports for its subscribers, each of which includes various metrics on a distinct aspect of the broiler chicken production process:

- **Broiler Live Reports** provide anonymized information about six aspects of chicken production for each processor complex: (a) breeders and hatching egg production; (b) hatchery; (c) feed mill; (d) ingredient purchasing; (e) feed formulation; and (f) broiler production efficiencies and total live production costs.

- **Broiler Processing Reports** include a variety of anonymized metrics related to the slaughter and processing of broiler chickens into saleable poultry products.

- **Express Sales Reports** compare the processor's own prices with the national average for a bundle of products that Agri Stats has grouped together. The reports also compare the processor's aggregated total net price for all products that a complex produces to a hypothetical price if other complexes produced the same mix of products.

- **Customer Sales Reports** show the individual report recipient its own product sales broken out by customer and product, compared against the national average for a bundle of products that Agri Stats has grouped together.

- **Operations Profit Reports** contain anonymized information regarding processor profit margins and costs through the full production process.

- **Bottom Line Reports** provide anonymized information about the overall profitability of each company compared to that of other subscribers. The report contains no price or output information.

*Id.* at ¶¶ 6, 9, 14–21; *see also* Dkt. Nos. 5899-15–5899-21 (exemplar reports).

6

As the District Court properly concluded, it is undisputed that Agri Stats' reports are defined by the following features. *First*, they are based solely on historical data, on average 45 days old at the time the reports are sent to subscribers. Dkt. No. 5899-2 at ¶ 8. Agri Stats does not collect any forward-looking data from its subscribers. *Id.* at ¶ 7. *Second*, the reports are fully anonymized. *Id.* at ¶¶ 6, 14–19. Subscribers know only their own data. All remaining data in the reports are anonymous and do not identify the submitting subscriber. *Id.* at ¶ 13. *Third*, the reports do not reveal a subscriber's production volumes or prices to any other subscriber. *Id.* at ¶¶ 23–25, 44. No data field in any Agri Stats report provides a subscriber with the historic, present, or future production volume or price of broiler chickens for any other producer. Instead, the reports compare a recipient's *efficiency* metrics with those of anonymous competitor plants and a recipient's prices with industry *averages*. *Id.* at ¶¶ 10, 12–13.

Express Markets, Inc. ("EMI") is an independently operated subsidiary of Agri Stats. *Id.* at ¶ 32. EMI is not, and has never been, a party to this litigation. EMI offers analytic services and weighted average price reporting for various chicken products. *Id.* at ¶¶ 33, 35, 37.

EMI, however, does not identify who is selling or buying those products or how much any specific seller charges or buyer pays. *Id.* at ¶ 35. EMI's services, including its price reports, are available to anyone interested in subscribing, and its forecasts are based on publicly available data collected and reported by the United States Department of Agriculture ("USDA"), which, like Agri Stats, tracks and reports a variety of metrics related to broiler chicken lifecycles and production (and also volume metrics on which Agri Stats does not report). *Id.* at ¶¶ 30, 36, 39, 43.

Plaintiffs' brief repeatedly insinuates that Agri Stats' reports contain competitor price and output information. They do not. Plaintiffs are therefore left, as they were with the District Court, arguing that they can somehow proceed to a jury "[e]ven if the District Court were correct that Agri Stats lacked specific price and producer information." Br. at 54. The District Court was correct, and none of the evidence Plaintiffs cite is to the contrary. For example, the spreadsheet sent by Perdue to Sue Trudell purporting to contain production cuts is not an Agri Stats report or even prepared by an Agri Stats or EMI employee. *Id.* at 9–10.

## B. Investigations and Litigation against Meat Processors and Executives

In 2010, Agri Stats received a Civil Investigative Demand from the United States Department of Justice. Following an inquiry into whether Agri Stats' reports enable producers to coordinate on output or price, the Government closed the investigation without seeking any changes to Agri Stats' business. Dkt. No. 895 at 1.

Over the next decade, various groups of plaintiffs, all represented by the same counsel, filed a slew of class action lawsuits against America's largest protein producers and Agri Stats. A trio of cases, colloquially known as *Broilers*, *Pork*, and *Turkey*, alleged that the nation's leading broiler chicken, pork, and turkey producers used Agri Stats to facilitate supply-reduction agreements in their respective industries. *See In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-8637 (N.D. Ill.); *In re Pork Antitrust Litig.*, No. 0:18-cv-01776 (D. Minn.); *In re Turkey Antitrust Litig.*, No. 1:19-cv-8318 (N.D. Ill.).

Separately, the Government indicted several broiler chicken company executives alleging bid-rigging. The Government tried ten chicken company executives twice, each resulting in a hung jury. The Government then dropped all charges against five executives and retried

the remaining five a third time.  The jury acquitted all five defendants.
Notably, however, during closing arguments in the criminal cases, the
Government argued that Agri Stats and EMI "don't even tell you your
competitors' current pricing for a customer.  They are much more higher
[sic] level than that.  And they cannot be used to figure out this kind of
information . . . ." *United States v. Penn*, No. 20-cr-00152-PAB, Dkt. No.
1156, Trial Tr. Day 24, 4788:5–9 (D. Colo. Dec. 8, 2021).

On June 30, 2023, the District Court overseeing the *Broilers* action
granted Agri Stats summary judgment on all claims in Plaintiffs'
operative complaint in the case.  SA1–90.  Later that summer, and
thirteen years after closing its original investigation, the Government
sued Agri Stats seeking to enjoin its benchmarking reports and services
across the broiler chicken, pork, and turkey industries.  *United States v.
Agri Stats, Inc.*, No. 0:23-cv-03009 (D. Minn.).  That action, *Pork*, and
*Turkey* all remain pending at various stages of litigation.[3]

---

[3]     *Pork* is currently set for trial in May 2026.  Discovery is closed in both *Turkey*
and the Government's case.  Briefing on Agri Stats' summary judgment motion in the
Government case will be complete in December 2025.  Summary judgment briefing
in *Turkey* will be complete in early 2026.

In *Broilers*, only Defendant Sanderson Farms ultimately went to trial. The jury returned a verdict for Sanderson, finding that there was no agreement among defendants to fix prices. Dkt. Nos. 7014, 7015.

### C. The District Court's Summary-Judgment Decision for Agri Stats

*Broilers* was a consolidated antitrust proceeding brought against eighteen broiler chicken producers and Agri Stats by three classes of plaintiffs—direct purchasers; commercial and indirect purchasers; and end-use consumers. Only the consumer plaintiffs are parties to this appeal.

The District Court subdivided the case into two "tracks" based on the claims in the cases. The end-use consumer class, appellants here, were part of Track 1.[4] The gravamen of the consumers' claims was a classic price-fixing conspiracy: they alleged that chicken producers and Agri Stats agreed to increase prices and restrict the supply of broiler chickens, at least in part through Agri Stats' reports. *See, e.g.*, Dkt. No. 3748 at ¶ 1. In the alternative, the consumers alleged an "information

---

[4]    The principal distinction between Track 1 and Track 2 is that the Track 2 plaintiffs additionally asserted bid-rigging claims against certain processor defendants largely tracking the theories underlying the Government's failed criminal prosecutions. Agri Stats is not a defendant on any bid-rigging claim. The Track 2 plaintiffs' claims remain pending in the District Court.

exchange" claim no other plaintiff asserted: namely, that the chicken processor defendants' exchange of information through Agri Stats *itself* resulted in an anticompetitive output restriction or price increase. *Id.* at ¶ 197.

Discovery yielded a "massive" record; the parties exchanged over 150 million pages of documents and took over 400 depositions, culminating in twenty-eight motions for summary judgment. SA25. In response, the District Court undertook extraordinary efforts to ensure that "it had as complete a grasp as possible of the evidence in the case" before evaluating the merits of any motion. *Id.* To that end, the District Court provided the parties with a detailed accounting of the "evidence against each defendant" based on "its review of the summary judgment papers," and ordered "Plaintiffs to review the memo and present any additional evidence." SA26. Defendants were similarly ordered to "prepare a response to the evidence" identified by the District Court. *Id.*

After holding "two full days of oral argument" and evaluating the supplemental evidence, the District Court granted summary judgment in favor of Agri Stats and some of the producer defendants in a thorough 90-

page opinion. SA86–88. The court took Plaintiffs' price-fixing claim and their alternative "information exchange" claim in turn.

***Price-Fixing Claim.*** After surveying this Court's decisions in *Kleen Products LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 933 (7th Cir. 2018) and *In re High Fructose Corn Syrup Antitrust Litigation,* 295 F.3d 651, 654 (7th Cir. 2002), the District Court recited the familiar standard for summary judgment in a price-fixing case: to warrant trial, Plaintiffs must present evidence "sufficient for a reasonable jury to find a conspiracy by a preponderance of the evidence." SA3. This required evidence "that there was an actual, manifest agreement not to compete," SA23–24 (citing *Corn Syrup*, 295 F.3d at 661); evidence of "tacit collusion" or "parallel noncompetitive conduct" is "insufficient to prove a price fixing conspiracy," SA23. As the District Court correctly noted, both economic and "non-economic evidence of express agreement [are] generally necessary to prove a Sherman Act violation." SA24 (citing *Corn Syrup*, 295 F.3d at 661).

The District Court carefully considered the summary judgment record in light of these controlling legal standards, including the expert testimony proffered by Plaintiffs' experts, Dr. David Sunding and Dr.

13

Luis Cabral.  SA11–13.  For each Defendant, the court also scoured the record for "documented communications" that, "when taken together with the economic evidence[]" from these experts, might support an agreement to restrict the supply of broiler chicken.  SA25.  Although the court found no "proverbial smoking gun," it identified sufficient evidence, when viewed in the light most favorable to Plaintiffs, as to certain producer defendants.  SA25–43.[5]  The court concluded that insufficient evidence existed as to other producers.  SA43–62.[6]

As for Agri Stats itself, the District Court easily disposed of Plaintiffs' price-fixing claim.  *First*, the court explained that despite allegations in the pleadings that "Agri Stats reports contained producer-specific production and price data," discovery had revealed that "Agri Stats reports included only the production and pricing information of the recipient producer receiving the report, and not that of their competitors."  SA56–57 (internal marks omitted).  That meant "[e]ven if

---

[5]    Those defendants were Tyson, Pilgrim's, Sanderson, Harrison, Koch, Mountaire, Keystone, OK Foods, Peco, House of Raeford, and Simmons.

[6]    Those defendants were Perdue, Fieldale, Case Farms, Foster Farms, Claxton, and Wayne Farms.

Defendants succeeded in deanonymizing the reports, they could not have learned their competitors' production and pricing information." SA57.

*Second*, the court explained that, while the anonymized data available through Agri Stats may "permit an educated guess" concerning competitor production plans, "[g]uesses, even educated ones, are not evidence of an express agreement," and there is "no evidence" that Agri Stats data "would be a sufficient basis to establish or monitor a conspiracy." *Id.*

*Third*, the District Court observed that Plaintiffs' "expert on the effect of Agri Stats reports," Dr. Luis Cabral, had asserted (in careful language) that Agri Stats' reports contained information that "concerns" the output and pricing of individual producers. SA58. But as the court explained, Dr. Cabral had conceded elsewhere that Agri Stats' reports "did not actually contain output or pricing information," and had misclassified the reports as containing "current" pricing information, when that information "is at least a month old." SA58–59 (internal marks omitted). The court also explained that neither Cabral nor Plaintiffs had identified any evidence that "confidential production and

15

pricing information" is somehow communicated through Agri Stats'
reports. SA58.

*Fourth*, anticipating this Court's subsequent holding that
"[d]elivering a lesson in microeconomics does not violate the Sherman
Act," *Amory Invs. LLC v. Utrecht-Am. Holdings, Inc.*, 74 F.4th 525, 527
(7th Cir. 2023), the District Court concluded that various
communications by an EMI employee, Sue Trudell, and an Agri Stats
employee, Mike Donohue, were "unremarkable analyst advice," not
"evidence that they acted as a conduit for an agreement to reduce supply."
SA59–61.

*Finally*, the District Court explained that Agri Stats "did not stand
to profit directly from restricted supply and increased prices," because it
charges a flat subscription fee for its benchmarking services. SA61.
Therefore, "the economic evidence that is the foundation of Plaintiffs'
claims against the producers is fairly irrelevant to proving a claim
against Agri Stats." *Id.*

"Despite years of discovery," the District Court concluded,
"Plaintiffs simply have not produced sufficient evidence . . . that Agri

16

Stats agreed with the producer defendants to restrict supply and increase the price" of broiler chicken.  SA62.

Plaintiffs have not appealed the District Court's judgment for Agri Stats on the price-fixing claim.  Br. at 5 n.17.

***Information Exchange Claim.***  The District Court then turned to Plaintiffs' claim that the processors' exchange of information through Agri Stats itself violated the Sherman Act and state law.  The court explained that this claim is subject to the "rule of reason,"  SA2 (citing *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.)), and articulated and applied the three-step, burden-shifting framework found in *Ohio v. American Express Co.*, 585 U.S. 529, 541 (2018) (*Amex*). SA62.  The District Court concluded that Plaintiffs' theory failed at step one, at which plaintiffs must adduce evidence "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."  SA62 (citing *Amex*, 585 U.S. at 541).  Plaintiffs adduced no such evidence.

The District Court first evaluated the "nature of the information exchanged" in Agri Stats' benchmarking reports.  SA62 (citing *Todd*, 275 F.3d at 211).  Because the information provided by Agri Stats is

"generally 45 days old," does "not reveal competitors' production and pricing data," and only reflects "general market production and pricing data" that compares a "producer's data to market averages," the District Court held that Plaintiffs failed to raise a triable issue under their rule of reason theory. SA63–64.

The District Court also concluded that Plaintiffs failed to adduce sufficient evidence to raise a triable issue regarding harm to competition resulting from Agri Stats' reports. Indeed, in stark contrast to Plaintiffs' price-fixing claim—where there was evidence that certain processors exchanged "production information through emails, public statements, and other forms of communication," purportedly causing an industry-wide decrease in output—the District Court concluded that there was "scant evidence that the information Agri Stats *itself* provided to each individual producer was used in a manner that had an anticompetitive effect." SA64–65 (emphasis added). Because the District Court concluded that Plaintiffs had failed to raise a triable issue of anticompetitive effects resulting from the Agri Stats reports, it did not reach the second or third steps of the rule of reason.

The District Court accordingly granted all defendants summary judgment on Plaintiffs' information exchange claim.  SA65.  Plaintiffs have appealed only the judgment for Agri Stats.[7]

## SUMMARY OF ARGUMENT

**A.**  Across nearly every sector of the economy, trade associations, government agencies, and independent benchmarking companies, like Agri Stats, collect and disseminate data from industry participants.  The Supreme Court has long held this kind of information exchange between competitors presumptively lawful and harmless unless it meets certain "well-established criteria."  *Todd*, 275 F.3d at 211.  In particular, absent an exchange of current or future (or both), non-public, transaction-level, price or output information, the mere disclosure of information cannot plausibly harm competition.  And even then, the law is clear that information exchanges cannot violate the antitrust laws unless they actually harm competition market-wide by way of higher prices or reduced output.

---

[7]    The direct purchaser class and the commercial and institutional indirect purchaser class agreed not to appeal the District Court's summary judgment ruling in exchange for Agri Stats not seeking costs to which it was otherwise entitled.  Certain individual opt-out Track 1 plaintiffs against whom Agri Stats also won summary judgment likewise have not appealed.

**A.1.** The District Court, after scouring the vast record amassed by Plaintiffs, rightly concluded that Agri Stats' benchmarking reports did not contain the features of an unlawful information exchange. Agri Stats' reports are aggregated, anonymized, historical, and do not include any competitor price or output information. The District Court did not, as Plaintiffs claim, misconceive the age and content of Agri Stats' reports. The reports speak for themselves—and they do not contain current price and output information. Tellingly, Plaintiffs do not marshal any record evidence that contradicts the District Court's conclusions. Nor do Plaintiffs cite any authority that would allow their claims to reach a jury based solely on the nature of Agri Stats' benchmarking reports and services.

**A.2.** Rather, regardless of the nature of Agri Stats' benchmarking reports and services, this Court's precedents require Plaintiffs to adduce evidence that they caused a substantial, adverse, and market-wide effect on competition to survive summary judgment. But neither of Plaintiffs' expert economists analyzed whether Agri Stats' reports and services caused a reduction in output or increase in price. Instead, Dr. Sunding's "overcharge regression" analysis evaluated a different claim (the now-

abandoned price-fixing claim) based on different conduct (publicly announced supply cuts, direct communications regarding planned production cuts, etc.). Dr. Cabral performed no quantitative analysis at all. And Plaintiffs effectively concede that the various anecdotes—showing (i) subscribers comparing their prices to Agri Stats' nationwide averages; and (ii) Agri Stats and EMI communications with subscribers concerning industry production based on public data—cannot meet their burden, because isolated examples say nothing about whether overall prices for broiler chicken increased, decreased, or stayed the same. Plaintiffs never connect a subscriber's use of Agri Stats' reports to an actual price or output effect. Agri Stats is aware of no information exchange claim that has proceeded past summary judgment when, as here, there is no evidence of actual anticompetitive effects.

**B.** This Court should reject Plaintiffs' misguided criticisms of the District Court's careful and even-handed opinion for the above reasons relied upon by the District Court. However, this Court also may affirm on at least three alternative grounds.

**B.1.** Antitrust law requires private plaintiffs to demonstrate that their loss flows from conduct that reduces output or raises prices.

Plaintiffs' sole theory of harm is that they paid higher prices for broiler chicken products than would otherwise prevail in a competitive market. Because Plaintiffs failed to adduce evidence linking Agri Stats' benchmarking reports and services to higher overall prices (or any competitive harm), they cannot show they suffered an "antitrust injury."

**B.2.** Plaintiffs' information exchange claim fails on appeal because they challenge only the judgment granted to Agri Stats, not the producer defendants. Market power is an essential element of Plaintiffs' remaining claim. Yet, Agri Stats has zero market share—it does not produce or sell chicken—and therefore has no ability to raise prices or reduce output. Plaintiffs do not challenge the District Court's conclusion that the producer defendants' participation in Agri Stats' benchmarking service is lawful, and they are therefore precluded from relying on the market share and pricing practices of those dismissed processors to satisfy their burden of showing market power.

**B.3.** Finally, Agri Stats presented substantial evidence that its reports and services generate substantial procompetitive benefits, such as efficiency gains, cost cutting, a threefold increase in per capita production of boneless, skinless breast meat, and a seventy-five percent

inflation-adjusted price decrease in breast meat. Plaintiffs did not advance any proposed modifications to the Agri Stats reports that would preserve those efficiencies.

This Court should affirm.

## STANDARD OF REVIEW

This Court reviews the District Court's grant of summary judgment *de novo*, drawing reasonable inferences from the evidence in favor of the non-movants. *Moultrie v. Penn Aluminum Int'l, LLC*, 766 F.3d 747, 751 (7th Cir. 2014).

## ARGUMENT

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy[] in restraint of trade or commerce." 15 U.S.C. § 1.[8] The Supreme Court "has long recognized that, in view of the common law and the law in this country when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean 'undue restraint.'" *Amex*, 585 U.S. at 540 (citation modified). "Whether a challenged restraint is undue or unreasonable for purposes of the

---

[8] Plaintiffs do not contend that the standards applicable under state antitrust law governing information exchange claims differ from those applicable under federal law. Accordingly, federal law controls the issues on this appeal.

Sherman Act depends on its effect on competition, especially its capacity to reduce output and increase price." *Fourqurean v. NCAA*, 143 F.4th 859, 866 (7th Cir. 2025) (internal marks and citation omitted).

Some restraints, such as Plaintiffs' now-abandoned price-fixing claim, are illegal *per se*, "regardless of consequences or possible justifications," *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1007 (7th Cir. 2012), because they are "so plainly anticompetitive and so often lack any redeeming virtue," *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 7–8 (1979) (citation modified).

Other agreements, such as the information exchanges claim at issue on this appeal, are presumptively lawful, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at *9 (D. Md. Sept. 16, 2020) ("[S]haring price information is presumptively lawful."), because the "exchange of price data and other information among competitors" may "increase economic efficiency and render markets more, rather than less, competitive." *Gypsum*, 438 U.S. at 441 n.16.

Accordingly, antitrust challenges to information exchanges are subject to the rule of reason: a multi-step, burden-shifting framework

24

that requires courts to assess market power and market structure to determine a challenged practice's "actual effect" on competition market-wide. *Amex*, 585 U.S. at 541 (citation modified). At the first step of a rule of reason case, the plaintiff bears the initial burden of showing "that the challenged restraint has a substantial anticompetitive effect." *Id.* A showing of "market power is essential to any claim under the Rule of Reason," *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 702 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 1057 (2024) (citation modified), because without such power a firm or group of firms lack "the ability to raise price profitably by restricting output," *Amex*, 585 U.S. at 549 (emphasis omitted).

To satisfy step one, the plaintiff may offer "direct" or "indirect" evidence that a challenged practice causes a substantial, market-wide harm to competition. *Amex*, 585 U.S. at 542. Direct evidence is "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* (citation modified). Indirect evidence requires "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* Indeed, this Court has been clear that "unless a contract reduces output

in some market, to the detriment of consumers, there is no antitrust problem." *Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) (citation modified); *see Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005) ("Antitrust law condemns practices that drive up prices by curtailing output.").

If the plaintiff meets its initial burden, "the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Amex*, 585 U.S. at 541. Finally, at step three, if the defendant comes forward with evidence to satisfy its burden, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.

"Courts have disposed of nearly all rule of reason cases in the last 45 years on the ground that the plaintiff failed to show a substantial anticompetitive effect." *NCAA v. Alston*, 594 U.S. 69, 97 (2021) (citation modified). This case was no exception; the District Court correctly concluded that Plaintiffs' rule of reason claim foundered at step one. SA64–65. The record here amply supports that conclusion.

### A. Plaintiffs Identify No Evidence that the Information Exchanged Through Agri Stats Caused a Substantial Anticompetitive Effect

There are two reasons antitrust law concerns itself with information exchanges. One is when they are a tool in an express agreement to fix prices or restrict output. *Todd,* 275 F.3d at 198. In that situation, the information exchange is but evidence of a different anticompetitive agreement, which is *per se* unlawful. Plaintiffs alleged such a claim below—indeed, it was their principal claim—but the District Court granted Agri Stats summary judgment on it, and Plaintiffs have not appealed. Br. at 5 n.17.

The second reason antitrust law may concern itself with information exchanges is when the parties to the exchange use the information exchanged itself to coordinate on price or output oligopolistically—what this Court has called tacit collusion, *see In re Text Messaging Antitrust Litig.,* 782 F.3d 867, 871 (7th Cir. 2015)—that would not have been possible absent the information exchange. *See, e.g., United States v. Container Corp.,* 393 U.S. 333, 336–37 (1969) (exchange of current price information that stabilized market prices held unlawful). To survive summary judgment, Plaintiffs' information exchange claim

27

had to fit into this second category. The record comes nowhere close to supporting an inference that it does.

To begin, the hypothesis of tacit collusion is highly implausible here. Tacit collusion is most likely when there are a few firms and the smaller firms can play "follow the leader" and coordinate their prices that way. *See Text Messaging*, 782 F.2d at 871. But Plaintiffs sued eighteen processor defendants of varying sizes who sell hundreds of products. The idea that so many firms may collude across so many products without express agreement warrants a jaundiced eye. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[I]f the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—[antitrust plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary" to survive summary judgment). Thus, Plaintiffs started with a considerable hill to climb, and the evidence they mustered, as the District Court's thorough analysis established, got them nowhere near the summit.

The twin pillars supporting the District Court's summary-judgment opinion are that (i) the "nature of the information exchanged" through

Agri Stats did not fit within the "well-established criteria" courts employ to "ascertain the anticompetitive potential of information exchanges;" and (ii) there was no evidence that defendant producers used Agri Stats' benchmarking metrics in a manner that caused "an adverse effect on competition market-wide." *Todd*, 275 F.3d at 211–13.

The District Court's initial focus on the nature of the information exchanged is borne out by a century of decisions establishing an exchange of information among competitors is presumptively lawful unless it includes the communication of current or future (or both), non-public, transaction-level, price or output information. *Id.* at 211–13; *compare Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 586 (1925) (exchange of historical, aggregated, or public information is lawful) *with Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 398 (1921) (exchange of present and future information, including discussion of defendant-specific production plans, effectuated a price-fixing agreement).

That "well-established" gating criterion, however, only scratches the surface of Plaintiffs' burden at step one of the rule of reason. For their information exchange theory to survive summary judgment,

Plaintiffs needed to show *both* that the information exchanged through Agri Stats is of the type that could potentially generate anticompetitive effects *and* that it actually harmed competition. *Todd*, 275 F.3d at 214. "This was no slight burden." *Alston*, 594 U.S. at 97.

Plaintiffs gloss over the latter requirement, focusing almost entirely, as they did before the District Court, on the former and trying to manufacture factual disputes that way. *See, e.g.*, Br. at 6–21, 40–49. But there are zero disputed facts regarding the age and content of Agri Stats' reports. Plaintiffs identify no evidence contradicting the District Court's conclusions and no law that would permit their claims to proceed to a jury based solely on the nature of the reports. Regardless, the District Court correctly granted summary judgment for the independent reason that Plaintiffs never identified any evidence showing that Agri Stats' reports caused harm to competition, such as higher prices or reduced output.

1. **The Undisputed "Nature of the Information Exchanged" Cannot Prove a "Substantial Anticompetitive Effect"**

Plaintiffs devote the lion's share of their brief to the characteristics of Agri Stats' benchmarking reports. Yet, Plaintiffs cite no evidence from

the summary judgment record conflicting with the District Court's conclusions. Instead, Plaintiffs merely repackage the same arguments the District Court already considered and rejected as unsupported by the extensive record in this case. That is no reason to disturb the District Court's sound decision.

*First*, Plaintiffs contend that the District Court mistakenly held "that Agri Stats reports were too old—meaning historic—to be used for anticompetitive purposes." Br. at 11. The District Court, drawing on the actual record evidence, correctly recognized that Agri Stats' reports rely exclusively on historical data that is, on average, 45 days old. SA63. There appears to be no fact dispute on this point; Plaintiffs even credit the *Pork* court's identical observation in its summary-judgment decision. Br. at 53. That Agri Stats issued both weekly and monthly reports—a fact the District Court considered, SA63—does not change the historical character of the information or permit the inference that the reports are current.

Plaintiffs also continue to conflate Agri Stats with its independent subsidiary, EMI, a non-party. The weekly and daily reports Plaintiffs cited below and in their brief before this Court, *see* Br. at 10–11, are

31

almost exclusively EMI products and services not relevant to the issues framed by the pleadings or material to this appeal.[9]  And the *only* portions of the record Plaintiffs cite purporting to identify "weekly" Agri Stats reports, *see id.* at 12, lead to a dead end.  They point only to stray, conclusory statements in expert reports containing no actual information concerning what report Agri Stats sent on what interval.[10]

Plaintiffs' reliance on *allegations* from the Government's pleading, Br. at 12 n.48, underscores the weakness of this argument.  *Cf. Thomas v. Wardell*, 951 F.3d 854, 860 n.6 (7th Cir. 2020) (observing that "district court[s] can only decide based on the record when the motion was brought" and "appellate review is limited to the record when the decision was made").  A plaintiff cannot rely on its own allegations at summary judgment but must produce evidence to support its claim.  *See Donovan*

[9]  A1618–19 (expert report identifying the EMI Commodity and Freezer Inventory reports as being available weekly); A1636–37 (expert report stating—without citation—that "[t]aken together, the EMI and Agri Stats pricing reports provide extremely current" information).  Furthermore, all EMI forecasts rely on USDA data and are available to anyone who wishes to subscribe.  Most EMI subscribers are chicken *buyers*, not chicken producers, which may explain why Plaintiffs never sued EMI.

[10]  A273 (citing to the same expert report discussion at A1600–02, addressed *infra*); A285 (citing a monthly report with data that is on average 45 days old); A303 (citing to the same expert report discussion at A1618–19, addressed *supra* n.9); A1600–02 (expert report noting that Agri Stats sent reports "on a weekly or monthly basis" without identifying what reports were sent).

*v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). It certainly may not rely on allegations in a different case, particularly one filed three months *after* the District Court granted Agri Stats summary judgment.

At bottom, Plaintiffs argue only that their expert believes that "one or two months old" information is sufficiently current. Br. at 12. But "[t]he Supreme Court has made clear that . . . . the exchange of past price data is greatly preferred" by courts because it poses little to no risk of competitive harm. *Todd*, 275 F.3d at 211 (internal quotation marks omitted). Without current or forward-looking information on their competitors, Agri Stats' subscribers cannot coordinate tacitly on their prices or their output. Neither the Supreme Court nor, as best as Agri Stats can tell, any court of appeals has condemned the exchange of 45-day-old benchmarking data. *Cf.* SA63 ("Plaintiffs have cited no authority that exchange of 45 day old information can constitute anticompetitive conduct.").[11]

---

[11]  The *Pork* court stands alone in this regard. 781 F.Supp.3d 758, 869 (D. Minn. 2025). Agri Stats respectfully submits that the *Pork* court's conclusion was in error. But regardless, the *Pork* decision is of no moment here. Plaintiffs here alleged that broiler chicken is the relevant market. Dkt. No. 3748 at ¶¶ 126–133. They never explain how separate reports concerning a different product market in a different case could possibly raise a triable issue. *See Israel Travel Advisory Serv. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1252 (7th Cir. 1995) ("[A] market is defined to aid in identifying any ability to raise price by curtailing output").

*Second*, Plaintiffs argue that the District Court erred by finding that Agri Stats' reports "did not provide producer or price information." Br. at 11. But the reports speak for themselves, and there is no dispute over their content. Agri Stats provided the District Court with a complete set of its benchmarking reports at summary judgment. Dkt. Nos. 5899-15–5899-21. After careful review, the District Court explained that it is undisputed that Agri Stats' reports do not contain the production volume or output for any company other than the report recipient, or the historic, current, or future pricing information of any competitor company. SA63.

Plaintiffs cannot dispute that the reports lack competitor price or output information. Instead, struggling to identify a factual dispute where there is none, Plaintiffs trot out three arguments: (i) Agri Stats reports can be "deanonymized;" (ii) Agri Stats reports can be used to "monitor" competitors; and (iii) Agri Stats reports contain certain "forward-looking" information even though they lack competitor price and output information. Br. at 15–20. The District Court considered each argument and properly concluded that no evidence supports any of them. SA63.

Plaintiffs first cite evidence that they claim shows subscribers "deanonymizing" Agri Stats reports. Br. at 15–17. Notably, they cite no evidence that the "deanonymization" efforts resulted in correct guesses— or even that any processor made a business decision based on any allegedly "deanonymized" report.[12] More importantly, as the District Court recognized, evidence suggesting Agri Stats' subscribers tried to guess the anonymized data of their competitors is immaterial; even had subscribers successfully "deanonymized the reports, they would not have learned their competitors' production and pricing data," because such information "was not contained in the version of reports Agri Stats provide[s] to them." SA63. Any competitor "production and pricing information," the District Court observed, is not merely anonymized but is indisputably eliminated from the reports in the entirety. SA57.

Plaintiffs nevertheless maintain that Agri Stats' subscribers can connect the nonexistent dots and ascertain their competitors' transaction-level data. Br. at 18. But Plaintiffs have never explained

---

[12] Agri Stats produced terabytes of structured data that would have allowed Plaintiffs to test the accuracy of the "deanonymization" efforts. Plaintiffs offered no evidence on the point. Agri Stats reports cannot be "deanonymized" unless they are "deanonymized" *accurately*. Otherwise, the reports remain anonymized. If anything, by considering the "deanonymization" argument, the District Court gave Plaintiffs the benefit of an inference that the evidence does not warrant.

how a subscriber could circumvent "the firewall of redacted information Agri Stats built" to obtain competitor output and price data without directly trading its individualized reports with another subscriber. SA59.

The anecdotal evidence Plaintiffs discuss at considerable length illustrates the point. Br. at 15–17. It shows that fewer than half of the defendant producers even attempted to guess their competitors in Agri Stats' reports. A302, A1714–16 (identifying nine out of the twenty-one defendants and co-conspirators attempting to guess competitors). Of those that did, *every* example Plaintiffs cite concerns the Bottom Line Report, Operations Profit Report, and Broiler Processing Report—reports that do not contain price or output information at all.

The Bottom Line and Operations Profit Reports provide the *overall profitability* of a company or complex—not price or output information.[13] With respect to the Broiler Processing Reports, Plaintiffs reference a single producer defendant attempting to guess its competitors' average bird weights. Br. at 18.[14] Information about average bird weight, as the

---

[13] *See* A2387, A2498, A2499–500, A3025, A3339, A3415, A3445, A3898–99, A4774, A4777 (discussing "deanonymization" efforts in the reports); *see also* Dkt. Nos. 5899-15–5899-21 (exemplar of the full collection of Monthly Books that a producer would receive).

[14] *See* A1697–98, A3897 (discussing Mountaire "deanonymization" efforts).

District Court noted, is not output information, nor is it a proxy for output. SA58. A company producing twenty birds at an average weight of six pounds has a greater output than a processor producing ten birds at an average weight of eight pounds. Since Agri Stats reports do not show subscribers the *number* of birds produced by any other company, no recipient of an Agri Stats benchmarking report can divine the production volume or output of its competitors.

Plaintiffs next insinuate that some defendant producers "monitored" or "tracked" their competitors using Agri Stats reports. Br. at 18–21. As a legal matter, it is not clear how this supposed "monitoring" function relates to the information exchange claim. Monitoring is ordinarily related to the policing of cartel behavior, but Plaintiffs lost their *per se* supply-restriction claim and have not appealed that judgment. To the extent that it has any relevance to the information exchange claim before this Court, none of the supposed "monitoring" evidence shows a competitor discussing any other competitor's current or

future business plans, output, or pricing.[15]  Again, this is not surprising because the reports contain no such information.  SA63.

Plaintiffs obliquely refer to "forward-looking information" contained in Agri Stats' reports, Br. at 19, but the metrics they cite are historical (again, on average 45 days old) and are not measures of production, as the District Court concluded.  SA63 ("The Agri Stats information is generally 45 days old" and "did not reveal competitors' production and pricing data").[16]  Thus, they do not permit any subscriber to determine a competitor's current or planned future output.  Plaintiffs identify no evidence that these metrics allowed *any* processor to identify *any* competitor's output.

*Third*, the authorities Plaintiffs cite purporting to condemn information exchanges, namely *American Column* and *Container Corp.*, are no panacea.  Br. at 41–46.  The information exchanged in those cases

---

[15]  *See* A433–35, A1620–24, A3605, A3890, A3898, A4383, A4767–69 (Tyson analyzing *its own* sales of particular Tyson products in relation to *its own* production, which is the only information available in the Express Sales Reports); A3605, A3899 (discussing Tyson's review of egg set information from Agri Stats in relation to *the entire industry*, which is information also published by the USDA); A3573–97, A3897 (making a statement about the industry writ large using numbers that the witness later testified were from USDA, not Agri Stats).

[16]  *See* A803–11, A1694–96, A3896 (identifying a variety of metrics related to the early life cycle of a broiler chicken).

differs significantly from that here. *American Column* dealt with a "gentleman's agreement" to fix prices masquerading as an information exchange through a lumber trade association. 257 U.S. at 411. *Container Corp.* did not even involve an information exchange organized by a trade association or third-party aggregator like Agri Stats; instead, a competitor would speak directly to a rival "whenever it needed" its competitor's "most recent price charged or quoted." 393 U.S. at 335–36. And, crucially, in both cases the defendants provided current price or output information on specific transactions, as opposed to the aggregated, historical efficiency metrics and industry averages that Agri Stats supplies.

### 2. Plaintiffs Identify No Evidence of Actual Anticompetitive Effects Attributable to Agri Stats' Reports

Regardless of the age and content of Agri Stats' reports, Plaintiffs also must come forward with evidence of substantial anticompetitive effects. *Amex*, 585 U.S. at 541. Yet, Plaintiffs adduced no evidence that Agri Stats' benchmarking reports and services caused any increase in price or reduction in output *at all*, much less the substantial, market-wide effect necessary to reach a jury. Plaintiffs attempt to rely on two

plaintiffs-side expert economists, Dr. Sunding and Dr. Cabral, and anecdotal evidence. But neither economist actually analyzed whether the Agri Stats reports *themselves* caused a reduction in output or increase in price. And anecdotes cannot meet Plaintiffs' burden at summary judgment.

***Expert Evidence.*** Neither Dr. Sunding nor Dr. Cabral conducted *any* analysis showing any price or output effect from Agri Stats' benchmarking reports and services. Br. at 49–51.

Dr. Sunding, for his part, evaluated whether the alleged overall supply-reduction conspiracy hurt competition and caused Plaintiffs to pay more for chicken. To begin, that analysis bears only on the *per se* claim Plaintiffs have abandoned on appeal. And in any event, Plaintiffs' *per se* claim is premised on a host of conduct—not just Agri Stats reports. Thus, even crediting Dr. Sunding's analysis, it says nothing about whether Agri Stats' reports and services caused competitive effects. *Cf.* A325–26 (describing Dr. Sunding's assignment).

In particular, Dr. Sunding's "overcharge regression" attempts to measure the statistical impact of the "alleged conspiracy" on "the price of chicken." A472. He purported to calculate that "whole bird prices were

40

elevated by 13.8 percent and breast meat prices were elevated by 17.2 percent during the class period." Br. at 50. But he specifically found that this price effect was caused *not* by Plaintiffs' information exchange theory, but instead by:

- "Defendant processors communicat[ing] with each other directly . . . to align production and prices," A411 (citation modified);

- "Chicken processors . . . shar[ing] non-public information concerning planned and current production cuts," A426 (citation modified);

- Defendant processors publicly "announc[ing] supply cuts or delayed expansion plans," A431;

- "Sales between competitors . . . often observed in cartelized industries," A437 (citation modified);

- Defendant processors "regularly visit[ing] one another's facilities," A452;

- Defendant processors "us[ing] two breeder slaughtering companies, Tip Top Poultry and Southern Hens, to monitor each other's actions to reduce industry breeder flocks," A454; and

- Other industry "benchmarks," like Urner Barry and the Georgia Dock, being used as "spot market" prices, A530 (internal marks omitted).

Dr. Sunding never attempted to determine the effects flowing from information exchanged through Agri Stats and never identified that exchange as a cause of any harm to competition.

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court encountered a similar disconnect between antitrust theories of liability and alleged harm to competition, there in the context of class certification. The plaintiffs in *Comcast* asserted four different antitrust theories of liability, each of which allegedly "increased cable subscription rates." *Id.* at 31. The plaintiffs' expert's model, however, "did not isolate damages resulting from any one theory of antitrust impact" and instead "assumed the validity of all four theories of antitrust impact initially advanced" by the plaintiffs. *Id.* at 32, 36. The district court rejected all but one of the plaintiffs' theories, but still certified a class based on the expert's model, reasoning that the plaintiffs "were not required to 'tie each theory of antitrust impact to an exact calculation of damages.'" *Id.* at 31–32 (citation omitted). The Third Circuit affirmed. But the Supreme Court reversed, emphasizing that "at the class-certification stage (*as at trial*), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Id.* at 35 (emphasis added) (internal marks and citation omitted).

Plaintiffs' position here is worse than their *Comcast* counterparts. For one, a plaintiff's burden is higher at summary judgment, which is, as this Court has put it, the "'put up or shut up' moment in a lawsuit." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (internal quotation marks omitted). For another, Dr. Sunding's analysis does not purport to measure the anticompetitive effect of *both* of Plaintiffs' liability theories; again, its sole focus is on the now-abandoned supply-reduction agreement theory—*not* the information exchange theory. *Cf. Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*, 41 F.4th 787, 792 (7th Cir. 2022) (theory of harm must match theory of liability). Moreover, even if Dr. Sunding attributed the competitive harm to both liability theories, it would be impossible, as the *Comcast* court found, to disaggregate the harms attributable to Plaintiffs' information exchange theory from their now-abandoned supply-reduction theory. 569 U.S. at 37–38 ("The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*.") (emphasis in original) (internal marks and citation omitted). Put simply, no jury could rely upon Dr. Sunding's analysis as evidence of harm from Agri Stats' reports alone without attributing to Agri Stats the effect of other

conduct—including conduct the District Court deemed lawful and Plaintiffs failed to appeal.

Dr. Cabral's analysis, for its part, does not fill the gap. To start, Dr. Cabral performed no quantitative analysis whatsoever and therefore provides no evidence of price increases or output reductions. His qualitative analysis does nothing to establish that the information exchanged through Agri Stats *actually* had any effect on competition, much less a substantial, market-wide effect. The District Court thoughtfully and thoroughly considered Dr. Cabral's opinion that Agri Stats' reports created "focal points for industry action" and are "inherently anticompetitive" in nature. Br. at 51.[17] It rightly concluded that theory and supposition are not enough to meet Plaintiffs' burden of proving the Agri Stats reports produced "a substantial anticompetitive effect." *Amex*, 585 U.S. at 541. Dr. Cabral offered no empirical analysis

---

[17] Dr. Cabral's opinion that the Agri Stats reports are "inherently anticompetitive" is not an economic opinion but rather an attempt to rewrite the legal standard governing analysis of information exchanges. Information exchanges are subject to rule of reason analysis. *Gypsum*, 438 U.S. at 441 n.16. No case has ever held an information exchange to be "inherently anticompetitive." That characterization is reserved for practices, such as price fixing or market allocation, that are *per se* illegal. *See, e.g., Copperweld Corp v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (describing price fixing and market allocation as "inherently anticompetitive").

demonstrating that the defendant producers used the information exchanged through Agri Stats to coordinate tacitly on output or prices. *See* Dkt. No. 6226-8, Exhibit 16 at 32:17–18, 35:5–17. And without any proof of such effects, that spelled the end of Plaintiffs' information exchange theory. *See, e.g.*, *Fourqurean*, 143 F.4th at 871 (reversing issuance of preliminary injunction granted without economic or empirical evidence of actual harm to competition).

Plaintiffs acknowledge they were required to come forward with evidence that Agri Stats' reports caused "a substantial anticompetitive effect that harms consumers in the relevant market" to survive summary judgment. Br. at 49–50. There is no such evidence. Plaintiffs also concede that it is not sufficient to look at the "format of the reported data" alone, *id.* at 54 (citing *Pork*, 781 F.Supp.3d at 871), and with good reason. Courts cannot "shift[] to a defendant the burden to show empirical evidence of procompetitive effects" without the need for the plaintiff to first demonstrate competitive harm at all. *Cf. Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 775 n.12 (1999). Again, Agri Stats is aware of no information exchange claim that a court permitted to proceed past summary judgment without evidence of actual anticompetitive effects.

*See, e.g.*, *Maple Flooring*, 268 U.S. at 567, 585–86 (rejecting information exchange claim when there was no evidence that conduct "affected prices adversely to consumers"); *Am. Column*, 257 U.S. at 396–98, 408–09 (considering whether prices "increased to an unprecedented extent" as a result of exchange of competitor production and price information). Plaintiffs have cited none.[18]

More pertinently, Agri Stats is unaware of any decision by this Court obviating the need for such proof under the rule of reason more broadly. Indeed, this Court's decisions go the opposite way. *See, e.g.*, *Chicago Pro. Sports*, 95 F.3d at 597 ("Lack of an effect on output means that the [challenged restraint] does not have antitrust significance."); *see also 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021) (rejecting "theoretical and anecdotal" evidence and concluding that actual anticompetitive effects could not be shown without "empirical analysis"); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016) (noting that "in no precedential opinion in this Circuit has a

---

[18]     The *Pork* court concluded, based in part on *different* expert analyses in that case, that disputes of fact existed as to whether the Agri Stats reports caused market-wide anticompetitive effects. 781 F.Supp.3d at 868. Here, Plaintiffs have no analyses showing an actual price effect from Agri Stats' benchmarking reports and services.

plaintiff successfully proved an adverse effect on competition without offering evidence of changed prices, output, or quality"); *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1085 (11th Cir. 2016) (affirming grant of summary judgment when plaintiff "failed to point to any actual detrimental effects" on competition and "presented no evidence of an actual reduction in output, or increase in price, or deterioration in quality"); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994) ("Speculation about anticompetitive effects is not enough. [Plaintiff] had to show that the [challenged practice] as it actually operated in the market harmed competition.") (citation modified); *Mil. Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987) (affirming entry of summary judgment when expert "based his conclusion on general economic theory and did not conduct any . . . studies . . . to determine the actual effect the appellees had on competition").

Plaintiffs offer no reason to deviate from that requirement here, when the only claimed injury is that they paid higher prices for chicken than would otherwise prevail in a competitive market—"the archetype, the paradigm, the Platonic form of antitrust impact." *See Arandell Corp.*

*v. Xcel Energy Inc.*, 149 F.4th 883, 900 (7th Cir. 2025). After all, "the whole point of the rule of reason is to furnish an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint to ensure that it unduly harms competition before a court declares it unlawful." *Alston*, 594 U.S. at 97 (citation modified). The District Court faithfully applied the rule of reason and rightly demanded proof of some market-wide harm to competition attributable to Agri Stats before allowing Plaintiffs' information exchange claim to reach a jury.

***Anecdotal Evidence.*** Plaintiffs also single out various anecdotes purporting to serve as evidence of anticompetitive effects, though they rightfully refrain from arguing that these discrete events are sufficient to meet their burden at summary judgment. *Cf.* Br. at 36, 49–55. This anecdotal evidence falls into two buckets: (i) instances of defendant producers comparing their prices to the nationwide average prices in Agri Stats reports, *see id.* at 21–27; and (ii) communications from an Agri Stats employee, Mike Donahue, and an EMI employee, Sue Trudell, regarding production, *see id.* at 30–37.

As a threshold matter, anecdotes and isolated examples are insufficient to show substantial, market-wide harm to competition at the

summary judgment stage. *See Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 719 (7th Cir. 2006) (affirming grant of summary judgment and expressing "serious doubts about the usefulness" of anecdotal evidence of anticompetitive effects absent "any statistical analysis focusing on measurable indices" of market-wide harm); *see also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (holding that plaintiffs "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.,* to competition itself"); *1-800 Contacts*, 1 F.4th at 118 (observing that "theoretical and anecdotal" evidence could not demonstrate market-wide anticompetitive effects). And in any event, anecdotes and isolated examples say nothing about whether *overall* prices for broiler chicken increased, decreased, or stayed the same as a result of the reports. *See Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1119 (6th Cir. 1983) (affirming judgment for defendants on information exchange claim because there was no evidence "the exchange of price information" resulted in market-wide anticompetitive harm).

*First*, Plaintiffs' anecdotes—all of which were before the District Court—do not even show isolated examples of actual price hikes, let alone

market-wide price increases.  Br. at 21–27.  Instead, *every* example they cite—listed below—merely identifies a broiler chicken producer comparing its own price to a nationwide average price, wishing that its own prices were higher (as all profit-seeking firms do).

- **Sanderson.**  Plaintiffs cite documents purporting to show that Sanderson compared its own prices to national averages in Agri Stats reports on a monthly basis. *Id.* at 22, 26.  But Plaintiffs do not identify a single price increase resulting from these comparisons. *Id.*[19]

- **Tyson Foods.**  Similarly, Plaintiffs cite documents purporting to show that Tyson also compared its own prices to national averages in Agri Stats reports.  *Id.* at 23–24, 26.  But, again, Plaintiffs cite no evidence showing that Agri Stats reports caused any actual price increase.  *Id.*[20]

- **Perdue Farms.**  Plaintiffs cite Perdue documents discussing supposed "action plans" for increasing prices on certain products. *Id.* at 24.  But there is no record evidence showing that Perdue successfully implemented a price increase based on information supplied by Agri Stats. *Id.*[21]

- **Pilgrim's Pride.**  Plaintiffs contend that Pilgrim's "targeted products and customers priced below the industry average," but do not identify any corresponding price increase for any product or customer supposedly "targeted."  *Id.* at 25.[22]

---

[19]  *Cf.* A286, A1636, A2119, A3553, A3555–69, A3571, A3637, A3895, A4758 (Sanderson anecdotes).

[20]  *Cf.* A286, A1637–39, A1722–23, A2646, A3728–29, A3823–24, A3826–28, A3830, A3832, A3834, A3837, A3897–98 (Tyson Foods anecdotes).

[21]  *Cf.* A3481, A3895 (Perdue Farms anecdotes).

[22]  *Cf.* A287, A1640–41, A3863–64, A3866–68 (Pilgrim's Pride anecdotes).

- **Mountaire Farms.** Plaintiffs assert that Mountaire compared its own prices against national averages in Agri Stats reports. *Id.* at 25. But, again, there is no evidence of any actual price increase connected to Agri Stats reports. *Id.*[23]

- **Wayne Farms.** Plaintiffs assert that Wayne Farms used Agri Stats data as a "one-way ratchet" to increase price, but cite no evidence that Wayne Farms used Agri Stats reports to actually raise prices on any product. *Id.*[24]

- **Foster Farms.** Plaintiffs cite a Foster Farms document comparing prices to national averages provided by Urner Barry—not Agri Stats. *Id.* at 26.[25]

- **OK Foods.** Plaintiffs cite a statement by an OK Foods employee that pricing below the national average reported by Agri Stats was "unacceptable," but cite no evidence of any actual price increase on any product. *Id.*[26]

It is unsurprising that none of the examples reflect an actual price increase because the broiler chicken market is highly competitive, and a broiler processor cannot unilaterally impose a price increase on sophisticated buyers who place their purchases out for bid. And on top of all that, none of the anecdotes remotely suggest a *coordinated* price increase, and Plaintiffs make no argument that they do.

---

[23]     *Cf.* A3425–26, A3895 (Mountaire Farms anecdotes).

[24]     *Cf.* A288, A1644, A3410–11, A3619–21, A3895 (Wayne Farms anecdotes).

[25]     *Cf.* A3354–56 (Foster Farms anecdote where the document cited has the subject line "UB pricing comparison").

[26]     *Cf.* A3464–65, A3895 (OK Foods anecdotes).

*Second*, the various communications from Mr. Donohue (from Agri Stats) and Ms. Trudell (from EMI)—which the District Court specifically addressed—likewise reveal no evidence of an actual price increase or output restriction. Indeed, the District Court properly viewed their statements as "unremarkable analyst advice" that never conveyed "specific confidential information," SA61. *None* of the communications that Plaintiffs cite convey data that Agri Stats or EMI collected from individual subscribers—all rely upon publicly available historical data, primarily from the USDA, or purely aggregated data. For example, Plaintiffs identify communications from Ms. Trudell in which she provided her opinion as an economist on the relationship between production and price, all using publicly available information, Br. at 29–34;[27] analysis that was also provided to broiler chicken *purchasers* like Kentucky Fried Chicken. *See* Dkt. No. 6397-3. Likewise, Plaintiffs cite communications from Mr. Donohue in which he relied on public information to opine on how production trends might affect pricing. Br.

---

[27] *See* A3183–3235, A3245, A3272–85, A3526–3551, A3613–14, A3891–94, A3983, A4151–59, A4414–70, A4502–14.

at 31–36.[28]  In both cases, Plaintiffs failed to adduce any evidence linking Ms. Trudell's or Mr. Donohue's statements to any producer's pricing or production decisions.  Taken together or separately, these messages "did nothing beyond remind the producers of something they doubtless learned in Economics 101: as long as demand curves slope downward, lower output implies higher prices."  *Amory*, 74 F.4th at 527 (7th Cir. 2023).  And this Court has unequivocally held that "delivering a lesson in microeconomics does not violate the Sherman Act."  *Id.* (citation modified).

The District Court correctly required Plaintiffs to provide proof that Agri Stats' benchmarking reports and services harmed market-wide competition before permitting their rule of reason claim to reach a jury.  They failed to do so.  Judgment for Agri Stats necessarily followed.  That judgment should be affirmed.

## B. Alternative Grounds Support the District Court's Decision

The District Court's summary judgment opinion was thorough, careful, and correct, and this Court can and should affirm summary

---

[28]    *See* A341–48, A1720, A3153–58, A3287–335, A3369, A3384–404, A3498–511, A3515–18, A3889–94, A4161–78, A4200, A4392–95, A4472–92, A4496–98, A4516–73, A4614–15, A4696–702.

judgment in favor of Agri Stats. But there were additional flaws in the Plaintiffs' case that the District Court had no reason to reach. *O'Brien v. Caterpillar Inc.*, 900 F.3d 923, 928 (7th Cir. 2018) (observing that this Court may "affirm on any ground supported in the record"). This Court thus can sustain the District Court's grant of summary judgment on multiple alternative grounds, including because Plaintiffs cannot show antitrust injury, market power, or that their information exchange claim would survive steps two and three of the rule of reason.

### 1. Plaintiffs Cannot Demonstrate Antitrust Injury

The dearth of evidence connecting Agri Stats' benchmarking reports and services to any competitive harm exposes a corollary flaw in Plaintiffs' information exchange theory: they have not adduced sufficient evidence of an "antitrust injury." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Antitrust law "requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers." *Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992). This "requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing*

aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original).

For that reason, antitrust injury is connected to harm to competition, and the failure to raise a triable issue of the former often flows from the absence of a triable issue on the latter. Here, Plaintiffs' sole claim of harm with respect to their information exchange theory is that they paid elevated prices for chicken as a result of output or price coordination *flowing from the Agri Stats reports and related services.*

Since Plaintiffs cannot show any increase in prices or decrease in output market-wide linked to Agri Stats' benchmarking, they likewise cannot demonstrate that they suffered an antitrust injury. *See Marion HealthCare*, 41 F.4th at 790 (antitrust injury demands proof that a plaintiff was "made worse off by higher prices or a reduction in output").

### 2. Plaintiffs Cannot Demonstrate Market Power

Plaintiffs have made hash of their rule of reason theory on appeal by challenging only the District Court's grant of summary judgment as to Agri Stats and not the producer defendants. Under the District Court's decision, the producer defendants' use of the information provided by Agri Stats is adjudicated to be lawful. SA65 (granting summary

judgment to *all defendants* on Plaintiffs' rule of reason claim).  Agri Stats

does not produce or sell chicken and therefore has no ability to raise

prices, much less possess the power "to raise price significantly higher

than the competitive level" market-wide "by restricting output."  *See Ball*

*Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1331 (7th Cir.

1986).  Thus, Agri Stats alone has no market power in the purported

relevant market.  The only firms that conceivably could are the defendant

producers—and the District Court granted summary judgment in their

favor.  Plaintiffs "voluntarily abandoned review" of that decision through

settlement and never sought vacatur.  *See U.S. Bancorp Mortg. Co. v.*

*Bonner Mall P'ship*, 513 U.S. 18, 29 (1994) ("Settlement does not justify

vacatur of a judgment under review.") (citation modified).  Plaintiffs are

therefore precluded from arguing now that these dismissed processors

used the Agri Stats reports to achieve oligopolistic pricing.  *See* 18A

Charles Alan Wright et al., *Federal Practice and Procedure* § 4433 (3d ed.

1992) (noting general rule that a final judgment from a lower court

carries res judicata effect even though it is still subject to review by an

appellate court).  Indeed, "under the doctrine of the law of the case, a

ruling by the trial court . . . that could have been but was not challenged

on appeal is binding in subsequent stages of the case." *Schering Corp. v. Ill. Antibiotics Co.,* 89 F.3d 357, 358 (7th Cir. 1996) (citation modified); *see Com. Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 211 n.6 (4th Cir. 2001). "Market power is essential to any claim under the Rule of Reason," *Deslandes*, 81 F.4th at 702, and Plaintiffs cannot satisfy their burden of proving market power now that the information exchange claim has been adjudicated in the processors' favor and abandoned on appeal. Plaintiffs' inability to prove market power provides another, independent reason to affirm the District Court.

### 3. Agri Stats' Reports Generate Significant Procompetitive Benefits That Plaintiffs Have Not Shown Could Be Achieved Through Less Restrictive Means

Because the District Court correctly found "scant evidence that the information Agri Stats itself provided to each individual producer was used in a manner that had an anticompetitive effect," it had no occasion to reach the second and third steps of the rule of reason analysis: whether Agri Stats produced evidence that its benchmarking services had procompetitive benefits and whether those efficiencies could be achieved through less restrictive means. SA64. Had the court gone further, the result would be the same: judgment for Agri Stats. As for step two, Agri

Stats put forth substantial evidence that its reports played a vital role in reducing the price of chicken in the United States. And as for step three, Plaintiffs put forth no evidence that those efficiencies could still be achieved through the "modifications" they propose. Dkt. No. 6226-8, Exhibit 17 at 259:22–260:9.

Agri Stats' benchmarking reports allow producers to identify opportunities to improve efficiencies and reduce costs, which in turn lowers the prices paid by Americans for chicken. Dkt. No. 6226-13, Exhibit 42 ¶¶ 426–435 (discussing specific examples of producers using Agri Stats reports to lower costs and increase yield). These are "the very purposes of the antitrust laws." *Am. Steel Erectors v. Local Union No. 7, et al.*, 815 F.3d 43, 60 (1st Cir. 2016) (observing that the core functions of antitrust laws are "encouraging efficiency, lowering costs, and increasing output"). In fact, since Agri Stats' founding, the per capita production of boneless skinless breast meat, the most demanded chicken product in the United States, has tripled, and the inflation-adjusted price of breast meat has declined by about seventy-five percent. Dkt. No. 5899-2 at ¶ 1.

Plaintiffs identify various ways Agri Stats' reports could be modified. Br. at 56–57. But they failed to adduce evidence (or explain

how) the procompetitive efficiencies that Agri Stats' services facilitate could be achieved if any of those "modifications" were implemented. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 45 (2d Cir. 2018) (rejecting antitrust challenge when plaintiff failed to prove "the equivalent viability" of its proffered alternatives); *King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 409 (3d Cir. 2015) (antitrust laws do not require "that parties must reach the most procompetitive [arrangement] possible"). Moreover, none of the putative "modifications" are tethered to any data elements that allegedly spawned anticompetitive effects. In *Alston*, the Supreme Court cautioned that, at step three of the rule of reason, "courts should not second-guess degrees of reasonable necessity so that the lawfulness of conduct turns upon judgments of degrees of efficiency," because doing so "would risk interfering with the legitimate objectives at issue without adding that much to competition." 594 U.S. at 98 (citation modified). Here, Plaintiffs' proffered "modifications" rest on bare conjecture, "and judicial acceptance of such imaginings" is a "recipe for disaster." *Id.* (citation modified).

# CONCLUSION

For the foregoing reasons, the judgment of the District Court should

be affirmed.

Dated: December 12, 2025      Respectfully submitted,

*/s/ William L. Monts III*
WILLIAM L. MONTS III
JUSTIN W. BERNICK
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

*Counsel for Agri Stats, Inc.*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the word limit set forth in Circuit Rule 32(c) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 11,842 words.

2. This brief complies with the typeface and type style requirements of Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font, with footnotes in 12-point font.

*/s/ William L. Monts III*

## CERTIFICATE OF COMPLIANCE

I hereby certify that on this 12th day of December 2025, I caused a copy of the foregoing to be served by electronic means via the Court's CM/ECF system on all counsel registered to receive electronic notices.

*/s/ William L. Monts III*
